Good morning. I should start by remembering the Chinese proverb, may we live in interesting times. I'm from South Carolina, where we elect our officials forever. Until last year, as you may know, our junior senator had only served for thirty-four years. It's my intention this morning to start with the Section 8F argument. I'm going to spend just several minutes with it, because I think it's fairly straightforward, and the observations I want to make are things that are not contained in our brief. The first thing, MRC argues that the word occurrence should not be drug into the insuring agreement or into paragraph A of the declarations page. And we, of course, say that, yes, indeed, it's referenced and says subject to the conditions and limitations in the declaration page. But beyond that, I just ask you to think about this. There's no contention by MRC that the Fred Guthrie claim or any other claim is not subject to the word occurrence. So why, since he has dreamed up this Section 8F occurrence, would we treat it any differently than every other claim? And to take it one step further, if you didn't bring the word occurrence into the policy, you wouldn't need any certificates of insurance over and beyond safety nationals, because we would just have unlimited coverage, because it wouldn't depend on occurrence. The second observation is, this is implied, but the argument that was made is, well, this case is no different than Mondra's. And we argue, oh, yes, it is, and that's in the brief. But the one thing that isn't clearly said in the brief is this. In 1977, MRC came on the risk. And in 1978, there was a filing, an 8F filing. And the question of what was known and unknown for purposes of the known and unknown risk doctrine, in 78, when they made their filing, there are already claims in 1977 that are hard, on the books, aren't going anywhere, and are absolutely known to Manhattan Reef. So there's not any question about was there going to be a Section 8F claim, because they were already there. I'm moving on. When I was a younger lawyer, I appeared in a case, and I had Justice Powell ask me this question. He said, have you ever noticed that when we remand non-jury cases, they seem to get decided the same way for another reason? And I said, well, Justice Powell, I'm sure the district court will take any instruction that you offer. And he smiled. They decided the case. They did reverse, and then decided it on other grounds. And I went away a very who's got a law degree, that would have occurred to him. And so what I would say to you is, I could argue here this morning that this check on the question of the Guthrie annuity creates a fact issue. And I believe in my heart of hearts, this court is going to decide that when it's your bank account, and in the record at 4402, you will see this is MRC's bank account. You will see at that same record, you will see in that same record that the person who is to sign this check is with Crawford. That's who signed it. And while you can't see it here, it's signed on behalf of MRC. How in the world there's not a fact issue created by that one document is beyond me. But I want to take Justice Powell's instructions and say, I think this court should rule as a matter of law in favor of my client. And I want to make just this observation. This really is a case between two insurance companies. That's exactly what it is. And here's why I think this court should rule with us as a matter of law. And I'd like for you to pick up your record and turn with me to tab 48. There are seven pages behind tab 48. And they all say this for succeeding years, starting in 92. In order to reduce your compensation payments, please advise Guthrie annuity amount received by Levino. And the reason is, as the letters make clear, they are reporting to the government for AF purposes the money paid out for Guthrie and the money received by Guthrie as an offset and are only reporting to the government the difference. Now, what's the significance of that? The significance is that when Manhattan Re was charging safety AF charges on a proportionate basis in allocating them to Guthrie, Manhattan Re is crediting safety the Guthrie annuity. Let me ask your view on this. I have a little difficulty seeing what difference all that makes and what difference it makes whether or not this was done as an agent of whoever. If the Guthrie annuity was not a structured settlement intended to benefit Guthrie, as I see it, it was just the functional equivalent of investing in General Motors stock and hoping that enough money would be made on that stock to fund a foreseeable obligation. So if that's true, then I have trouble seeing why any of that matters. All right. Judge, let me take that point and say I think that there are two ways for me to answer it. First, I want to say I understand the question when it has to do with the agency argument. However, the point I'm making here with the 8F is I'm not questioning whether they were agents or not, and the money should or should not have been credited because it was a financial vehicle. What I'm saying is that's not even an issue. We know that in the case of the Guthrie annuity, it was a financial vehicle that was being done. For example, in this record, meaning I'm saying it. Where does that get you? I mean, so it's a comma, therefore. All right. Well, what I would do, Judge, is let me just read to you from page 7, and this is what MRC says where it gets me. Also required is the amount you have received on the Guthrie annuity so the account can be brought up to date. The last book, Subro Recovery, totals $87,000. In 1994, when this letter was written, they say, MRC says, that's MRC writing, that we authorized you to book this as a Subro Recovery, and there's no dispute in this case that the Subro Recoveries come to safety. That's in Section 5 of the policy. So what I'm saying to you is, they're giving safety credit for the Subro Recovery under the 8F, and all I'm saying is, you're right. We should get it. We should get credit not just on 8F, but you have a Subro Recovery, if you will, and you should be giving it to us for purposes of preserving the later. And what this letter says is, we've been doing that, and indeed, Judge Reimer, if you go in the record to 26001, there's a letter from Manhattan Re that says, this is how you shall handle it, as a Subro Recovery. He says, if the Guthrie recovery from the annuity is handled as a Subro Recovery instead of a credit, this should eliminate my balancing-related problems. That's how this has always been done, up until MRC got a very nice lawyer and a very bright lawyer. I don't fault him for doing it. I'm just saying, this case is rocking along with safety getting the credit as it should, because that's how they've agreed to handle it. Now, let me answer the question that you pose. Forget that this is how it was handled until they got my colleague, Mr. Steadman, involved. What I would say is this, and I think it raises a very interesting and large public policy issue, Judge Reimer. Your point is, unless it's a structured settlement and results in settlement, why does it matter? And what I would say to you is this, do you want to take two insurers, and there's no relationship, Judge, built on trust, like a sedent and a reinsurer, do you want to take a relationship and say, oh, yeah, sedent, that's all right. You just go out, get yourself a little financial vehicle, and you can decide, is this a financial vehicle, or is it an annuity? And you just work it back and forth, and you benefit, and if you do, you keep it. And if you don't, well, maybe you choose at the end of this claim to handle it some other way. And what I would say to you is, isn't this really, and Mr. Steadman would agree with me on this, isn't this all about following the fortune? I mean, all I'm saying is, you went out, you bought an annuity through your own account, you've been receiving these benefits, it's worked to your advantage, why in the world, since you're my sedent, shouldn't I get credit for it? Would you be making the same argument if they had invested in a stock that just went through the ceiling?  And ended up with the same amount of money? I don't think so. Well, here's what I would say, Judge. I would hope that I would have the integrity to say, follow the fortune means just that. Sedents make a lot of bad decisions, and when they do, you can't come in and cherry pick. And all I'm saying to you here is, isn't the corollary to that, when you make a decision that has on it, it's not like it's a financial vehicle, it's paired, and says, for the Guthrie claim. I'm sorry, I see you wanted to ask a question. No, it's just asking the same question in a slightly different way. I mean, if in fact the company had had a ton of money, and hadn't seen any need to get an annuity to help it pay its obligations, would the point be the same? I think, Judge, we do get back to this. There's nothing that I'm going to provide you, and I don't think Mr. Steadman is either, that is going to say, here is a case that you can go to, or here is something definitive that you can use to decide this. Where I think you are, and why I think this is an important case, or where I think you are, is, don't you want to encourage sedents and reinsurers to lie in the same bed? And when the sedent takes an act, don't you want the fortune to be followed? Why create a schism? Would you want a primary carrier to go out and settle a case without a settlement order, and have a structure, and still have the excess carrier out on the limb, not knowing, well, am I going to be paying payments? No, but it's presumably you would have been part of the settlement anyway. Well, and in some ways, Judge, that defines the problem here. It being a workman's compensation claim with medical benefits continuing, it is much more difficult, and in paraplegia, I don't know that you could ever get, without a lot of trouble, some sort of, you all know what they're called, I don't. When you terminate someone's rights under the acts, it's difficult, especially in something like this, and it probably explains why it never happened. But again, the larger public policy issue, I think, is still the same, and I don't think there's anything to offer guidance. I think it's up to this panel to set the direction. Thank you very much for your time. Thank you, Joe. May it please the Court. Russ Steadman for Appali Manhattan Re. Your Honors, Safety National's entire opening brief, reply brief, and argument today makes not a single reference to the contract. This is a contract case. You have to start with the contract. And Mr. Efting said that there is nothing definitive out there, and this is a, implied it's a case of first impression. I disagree. I think this is a case that is very clearly resolved under existing Ninth Circuit law and existing reinsurance law. What we have is we have a facultative certificate. We have a second facultative certificate. They are identical. They both obligate Safety National to indemnify Manhattan Re. against losses or damages which Manhattan Re. is legally obligated to pay with respect to which insurance is afforded under the policy reinsured. The only other contingency is the loss has to occur when their certificates are enforced. So if Manhattan Re. is legally obligated to pay, Safety National has to reinsure. I have a question on that. On the one hand, that's right. On the other, the green, I believe was his name, the expert that you had, indicated that parties on reinsurance situation normally explicitly with respect to reinsurance of assessments. And there certainly is nothing explicit with respect to assessments, just the normal follow-the-form point. So my question is, is there a triable issue simply on that account? No, Your Honor, because the policy in Manhattan Re.'s underlying form expressly covers assessments. It covers them because it provides coverage for all liabilities under the Act, and that includes in a separate definition in its policy all assessments for special injury funds. So you have the underlying policy obligating Manhattan Re. to insure this liability. And an assessment is by law nothing more than a form of compensation. It's not a form of compensation that is identical to underlying injury claims. It is a separate type of compensation payable under the Act. That's covered under Manhattan Re.'s policy. It's therefore covered under the Safety National Certificates. Mr. Green, upon that, the contracts do allocate coverage and reinsurance for it. What Mr. Green's opinion was, which I think is correct, his opinion was that the contracts are silent as to how you may allocate and how you might therefore he provided testimony as to industry practice. And I would submit to the Court that in the National American v. Lloyds case, it's a Ninth Circuit decision from 1996. The Court there was trying to decide whether the follow the fortunes doctrine would be implied into every reinsurance contract. They had reinsurance contracts that were silent on that point. And the Court had conflicting expert testimony. One expert said, yes, it is implied, and that's proper expert testimony to consider. But they found a tribal issue of fact because there was conflicting expert testimony. There was other expert testimony saying, no, it's not implied under industry practice. Here we have one expert. He says the assessments are covered and are properly allocated the way Manhattan Re. has claimed in this case. There is no conflicting expert testimony. There can be no tribal issue of fact. And the Ninth Circuit in National American said that you are permitted as a court to consider that expert testimony to explain the meaning of the language and to imply terms where no contrary intent appears from the term of the contract. So what we have is we have contracts that are not silent as to coverage and reinsurance for assessment. They are silent to the issue of how you address allocation and to aggregate assessments. I don't think.          Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. So I understood his testimony, Your Honor. He testified that it's common in the industry to allocate it one way or the other and that here.... Well, I suppose. Right. And that here, because. Where does that get you? I mean, you can do it one way or the other, that's true. Which way? And to continue, his testimony is that because of the nature of the transaction which Manhattan RE retained a commission, but no net premium to reserve for the risk. It had to be passing all that risk on, and the reinsurers knew that, and that's his testimony. But it's not just Mr. Green's testimony, it's the law. If there's an ambiguity, it's construed against Safety National, number one. If it's silent as to this issue, then the court can, implied with the assistance of expert testimony, a proper allocation and aggregation. In fact, the single loss rule is the dominant rule. What we have is a situation. It isn't a single loss, though. I mean, the government, if I understand it correctly, determines each year whether it's going to assess and how much. And in fact, there was one year, I believe, during which there was no assessment. That was prior to this. So it's not exactly like deciding to manufacture asbestos and then starting to do it, from which you're going to have injuries from anybody who is in the line of fire. Here, the only analog I can think of is the government's decision to assess, and that's an annual decision, isn't it? It's an annual decision as to whether to assess and as to how much. And the year prior to the certificates being issued by Safety National, there was no assessment. The first year of Safety National's participation was the first assessment that arose from Manhattan Re's insurance under the policy. So you have an occurrence, you have a loss, excuse me, you have a loss that occurs for the first time during Safety National's coverage period. And under the single loss rule, it is very much like an asbestos issue. They distribute, manufacture and distribute asbestos in a year in which they are insured. All of the subsequent claims that come from that relate back to that single loss rule, and it's an accumulating loss. And that's exactly what Manhattan Re has done here. It's taken its first assessment that it can be linked in any way to its liabilities, to Levino under the policy, and it has accumulated them. It is also entirely consistent with the way in which the Guthrie claim works, for example. He suffered his injury in 1979, but every year there's more loss. It's unknown what that's going to be. He could die. He could have no medical. He could make a miraculous recovery. He could go back to work. Or he could continue to have loss as he has. But that is simply a single loss during a covered period that is reinsured that continues to accrue. And that's identical to the assessment. It's hard to see. I mean, it's because it's not just one assessment that keeps causing, that keeps growing. It's discrete assessments that have to be, and doesn't your policy peg loss or damages to those occurring during the year of the certificate, which would mean annually? No. It pegs the loss, which is the assessment that begin during the policy year, that Safety National is on the risk to the first assessment linked to the policy. Manhattan RE was on the risk in 1977. It had no assessments arising from the policy in 1977. It had no assessments in 1978. In 1979, Safety National reinsures Manhattan RE, and it gets an assessment. And that assessment is the assessment arising from losses or related to losses under the policy. Had there been no losses under the policy to individual claimants, it wouldn't get an assessment. And the assessment is a second form of compensation, payable, to help support the Second Injury Fund. From that point forward, that's its first loss, and that loss continues to accrue. And then when its policy terminates, that is the point in which Safety National's reinsurance terminates. So all of its assessments that it gets during that time period related to or rising from underlying payments to claimants, all of which have to occur as a result of its policy, have a runoff liability, just like the Guthrie claim. I would also suggest to the Court that what Mr. Green opined in part I think is relevant, that Safety National was in control of what it wanted to do with its certificate. It was a form certificate. That's undisputed. It left it silent on this point. That leaves it open to implied construction under industry practice. Mr. Green opined that had Safety not wanted this result, Safety could have written the policy, its reinsurance certificates differently. Second, what Safety has said is there's three possible interpretations. That means there's an ambiguity. If there's an ambiguity, it gets construed against them and in favor of Manhattan Re as a matter of law. I'll move to the Guthrie annuity unless the Court has further questions on the assessment. I think, Justice Reimer, you have it correct. What is occurring here is Safety National is attempting to avoid its reinsurance obligations based upon a lower-level indemnitores choice of funding arrangements. Levino had agreed to indemnify Manhattan Re and to pay retrospective premiums to make sure that Manhattan Re did not go out of pocket. How did it do that? It said, Manhattan Re, you issue a viable policy that's legally binding on you from first dollar for every claim. We will go help you arrange reinsurance once a claim hits the $250,000 layer. And then that coverage will be up to $750,000. And we'll arrange another layer of reinsurance, that's Safety National, which is $4.25 million in excess of that $750,000. So under this structure, and if we put it in context, Levino was a very large entity. It had approximately $100 million in gross receipts in the late 1970s. So it decided, with its claims department, its risk manager, its broker, to go for an alternative arrangement. That alternative arrangement essentially had it saying, I'm going to effectively be liable by having to pay indemnity to Manhattan Re for up to the first $250,000, but I want to be protected from catastrophic loss. I'm willing to bear that risk because I'm so big and I employ so many people and I have such big exposure under the Act, and I think this will save me money over a traditional fully insured program. How do they accomplish that? They get Manhattan Re to issue the policy. It's legally liable under the Act. The Department of Labor has licensed Manhattan Re to issue the policy, and Manhattan Re is liable. When Levino went through bankruptcy and when Eastport, the first level reinsurer, became insolvent, Manhattan Re still had to pay the claims, and it has to this day. It is not a sham transaction. What does it do next? It then arranges that excess reinsurance, and it says, I'm going to participate with Crawford in the adjustment of claims. Why would it do that? Because the majority of claims are going to be well below $250,000,  so it's really Levino's money, so of course Levino is going to be involved. In fact, Levino approved the Crawford & Company contract. If you look at that contract in 1979 with Manhattan Re, Levino signs it as approving it. So Manhattan Re is legally liable, but Levino has a very significant interest, and that interest is up to $250,000 of exposure. So what did it do? It bought the annuity to protect itself. The evidence shows that Levino alone conceived of the annuity, researched and selected it. The application doesn't mention Manhattan Re. Levino funded the annuity. It ran it through the Crawford account. I don't know why. The check says on behalf of Manhattan Re Insurance Company, Manhattan Re's predecessor. The testimony is that that was because it came out of the Crawford account. We suspect it was to allow Levino to track its expenditures. When you look at it, it says to Connecticut General Life, care of George Morrison, Levino Shipping. The check goes back to Levino. Levino sends it to the insurer to buy the annuity. Levino, all of the testimony from the gentleman, George Morrison, who arranged it, from the chief financial officer is that Levino paid for it and did it on its own without Manhattan Re's participation to protect only Levino's interests. Concurrent communications and writing that are in the record show that what Levino expected to happen was at the point of the $250,000 layer, the excess would kick in. The excess would start to pay, and it would actually have an asset. So it said, I'm going to have to pay $250,000. This man is so seriously injured that I know I'm going to have to pay it. Why not pay $147,000 today, be protected after $250,000, and have an asset? It was a smart financial decision, but it was only for Levino. The Elstrom case, which CQ National cites, involved an insurer that delegated express authority to the employer to handle enrollments into a group health program. There's no evidence of express delegation from Manhattan Re to Levino or Crawford to buy this annuity. In fact, there's no evidence of any involvement. Ultimately, what we have here is Safety National's management currently does not like the scope of coverage that certificates provided when they were issued 20 years ago. Safety National is happy to accept a lot of premium, and that premium has been sitting there earning interest and making money for them over the years. The record shows, undisputed, that is worth over $4 million today. Manhattan Re has never collected a penny from Safety National for anything, because it's a catastrophic layer excess re-insurer. The Guthrie claim and the assessments are the only thing that has even entered that layer. It's the only thing that Manhattan Re has come to Safety National and asked that it be reimbursed for. It has told Safety National there are a few other claims that may hit that layer. At this point, what we have Mr. Epting refer to wanting to follow the fortunes, Manhattan Re has lost a ton of money on a no-risk program that it retained no net premium to reserve for liability for. It finally gets some of these claims to its excess re-insurance layer with a re-insurer that isn't insolvent and it can't collect. And that's what this case is about. This case is about contract that bound Safety National 20 years ago to protect Manhattan Re, and Manhattan Re now is entitled to collect. And if you have no further questions, I'll submit. Thank you. Thank you. Thank you very much. Mr. Clark. Good morning, Your Honor. Justice Clark on rebuttal for appellant. Just on the last point that Mr. Steadman raised, what the present value of the premium really is relevant. If there is risk and if safety is responsible, as determined by this Court, then that's what it is. We believe at this point we have valid arguments for limiting its responsibility with respect to this claim. If there's other claims that come up without any issues, there's no issue about whether or not safety will pay. So in terms of what the present value is, it really has no impact whatsoever in terms of what the issues are here. On the 8F issue, I just wanted to reiterate one thing. Mr. Abting stated it also, but without the limitation, 750 to 2 million per occurrence or per accident or occurrence, what is it per? Without that limitation, what are you paying on? On the Guthrie claim, I mean, do you aggregate all claims? No, it's per accident or occurrence. And it specifically modifies the coverage language. In some of the cases that deal with the single loss rule, those are all premised on an accident or occurrence, and they specifically reference an occurrence. Before you can get to the next level of whether there's allocation, whether there's ambiguity or anything else, is it an accident or occurrence, or how are we going to deal with this? So on that point, we believe it has to be an accident or occurrence. We don't think that the assessments fall under either accident or occurrence. Assuming it is an occurrence, is there any ambiguity in the policy? Well, let's first look at how Manhattan treated these assessments for 20 years. Excuse me, Mr. Parker, am I misreading then the language? I'm looking into the general conditions. The reinsurer agrees to indemnify the company against losses or damages which the company is obligated to pay to which insurance is afforded during the term of this certificate. Why shouldn't we, with the help of Mr. Green, read that clause to include obligations to pay assessments to the fund which are triggered by it? I believe the portion you just read is followed by subject to limitations. Subject to the reinsurance limits and coverage shown in the declaration. And so it gets us back to what is the limitation here, $750 to $2 million per accident or occurrence. In terms of ambiguity, Manhattan followed a procedure for 20 years. What it did was it took the assessments and it allocated the assessments between among the various claims that were being paid by the Department of Labor under the Section 8F program. If there was ambiguity, I think they've resolved it themselves. 20 years of history, I think, means something. That's how that was interpreted for 20 years by Levino, by MRC, and at a minimum. Of course, MRC says you haven't paid them anything. So I guess it's right to say that your client's conduct has been consistent throughout the period. We've refused to pay, but I'm not sure that answers the question. Under their allocation methodology, it never reached the attachment points. But that's always going to be the case with regard to reinsurers, isn't it? There's always going to be a floor that has to be reached before the reinsurance obligation. Under their allocation, though, it would have continued occurring, and at the point that you reach $750, then safety's liability would have been reached. This isn't, I mean, this isn't a situation where the amounts were not accruing on this claim. It's how you treat the claim. Is it as an assessment, as a standalone, or do you tie it to an actual claim that arose out of an accident or occurrence? Why would you necessarily do that, since isn't the assessment itself to fund a fund for the future, not for the past? I mean, it's not to pay past claims, is it? Isn't it a way of forecasting? It's needs for the following year, and it projects what the needs will be based on Longshore Act insurers and employers, based on what their participation in terms of number of employees who've been injured and have been compensated. It's based on the claims history, basically. And just on that point, on the single loss issue, asbestos, this isn't asbestos. Asbestos, you have a single cause, which results in multiple damages. And so the courts look at it and say, well, let's go back to the cause. There's a single cause, that's a single claim. Here we've got multiple, hundreds of claims, which filter into an assessment. And applying the same logic applied by the courts, then you go back to the cause, and the cause are multiple causes. And that's the argument in terms of why there is a tie-back to a specific accident or occurrence. Just one last thing on the structured — on the annuity issue, addressing Judge Reimer's question to — I noticed my time was up. Can I just have a couple of quick moments to address that point? The difference between Manhattan going out and buying GM stock to fund this claim and what we have here is very different. One, there's no dispute that the Crawford account was maintained for MRC. It was supposed to be MRC's money in this account to pay MRC's obligations and liabilities under this program. Levino didn't go out and just buy the annuity, kept its books and whatever and, you know, signed checks. It bought this annuity by putting money into MRC's account. Okay. I'm kind of past that point, so — Okay. Thank you, Your Honor. So thank you very much for the argument just made. And the matter just argued will be submitted. Thank you very much, Judge. Thank you, Counsel.
judges: Wallace, Rymer, Tallman